The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

　　　　　　Plaintiff,

　　v.

EPHRAIM ROSENBERG,

　　　　　　Defendant.

NO. CR 20-151 RAJ

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

# TABLE OF CONTENTS

I.     JOINT RECOMMENDATION OF BOTH PARTIES AND THE UNITED STATES PROBATION OFFICE ................................................................................. 1

II.    SENTENCING GUIDELINE CALCULATION ................................................ 2

     A.     Guideline Calculation Without Applying the Pending Prospective Amendment. ... 2

     B.     Application of Prospective Guideline Amendment (§4C1.1) Effective November 1, 2023. ................................................................................................. 3

III.   The 18 U.S.C. § 3553(a) FACTORS ............................................................ 4

     A.     Nature and Circumstances of the Offense ............................................ 4

         1.     Mr. Rosenberg's History as an Amazon Seller and Amazon Seller Advocate. .................................................................................. 4

         2.     The Offense Conduct. ................................................................. 10

     B.     The History and Characteristics of the Defendant. ............................. 11

         1.     Mr. Rosenberg's Personal History and Characteristics. ................ 12

         2.     Mr. Rosenberg's Character. ......................................................... 15

     C.     Sufficient Punishment to Reflect the Seriousness of the Offense. ......................... 25

     D.     Adequate Public and Individual Deterrence. ..................................... 27

     E.     Remorse and the Need for Rehabilitation. ......................................... 28

     F.     The Need to Avoid Unwarranted Sentencing Disparity. ..................... 30

IV.   CONCLUSION .............................................................................................. 32

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – ii

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

This memorandum is respectfully submitted to the Court on behalf of Defendant Ephraim (Ed) Rosenberg, in an effort to assist the Court in determining the appropriate sentence to be imposed in this case. We respectfully urge the Court to consider the nature and circumstances of the offense, Mr. Rosenberg's outstanding character, and the degree of his atonement for his actions. We join with the Government in requesting that the Court sentence Mr. Rosenberg to, *inter alia*, a term of probation with one year of home detention. The United States Probation Office recommends that the Court impose sentence in accordance with this joint request. As shown below, the requested sentence is supported by careful consideration of all of the factors that traditionally inform the Court's exercise of its discretion.

## I.   JOINT RECOMMENDATION OF BOTH PARTIES AND THE UNITED STATES PROBATION OFFICE

Both the Government and the defense have reviewed and analyzed well over one million pages of discovery materials over the course of this multi-year investigation and prosecution. Each side has made detailed evidentiary presentations to one another analyzing the facts, the law, the United States Sentencing Guideline (USSG) calculations, and the 18 U.S.C. §3553(a) factors, to reach what is believed by the parties to be the appropriate sentencing resolution of Mr. Rosenberg's case. The Government's position as to sentencing was approved by the senior career federal prosecutors and at the highest levels of the United States Attorney's Office. Both sides have made presentations to the United States Probation Office to communicate the factual and legal rationale for this joint recommendation. The United States Probation Office (USPO) agrees with the jointly proposed sentence and likewise recommends that sentence be imposed as follows:

> Based on the factors set forth above, I believe a sentence of 2 years' probation, with one year of home confinement, is sufficient but not greater than necessary

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 1

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

to meet the goals of sentencing set forth at 18 U.S.C. §3553(a). This sentence acknowledges the seriousness of Mr. Rosenberg's offense behavior while also acknowledging his lack of criminal history.

USPO Sent. Rec. at 5. Considering the nature and circumstances of the offense, Mr. Rosenberg's personal history and character, and the extent of his atonement for his actions, we respectfully join with the Government and the United States Probation Office in requesting that the Court sentence Mr. Rosenberg to, *inter alia*, a term of two years' probation with a special condition of one year of home detention.[1]

## II.    SENTENCING GUIDELINE CALCULATION

### A.    Guideline Calculation Without Applying the Pending Prospective Amendment.

In the Plea Agreement, the Government and the defense agreed to the following stipulated Guideline calculations, as well as a proviso that no other guideline adjustments were warranted:

- A base offense level of 8, pursuant to USSG §2B4.1(a).
- An eight-level enhancement, pursuant to USSG §2B4.1(b), based on an estimated value of improper benefit conferred of more than $95,000 but less than $150,000.
- A three-level decrease for acceptance of responsibility, if the Court determines it is appropriate, pursuant to USSG §3E1.1(a) and (b).

USPO Final Presentence Report ("PSR") at ¶2. This calculation results in a total offense level of 13. With a criminal history category of I, the resulting Guideline range is 12–18 months. The Probation Office agrees with this calculation. *Id.* The parties' joint sentencing recommendation

---

[1] Notably, Mr. Rosenberg also pledges to perform 260 hours of community service by providing five 30-minute mentoring sessions each week for two years to assist, guide, and mentor individuals starting e-commerce sales businesses. This proposal has been designed by, and will be monitored by, the Aleph Institute, a highly regarded national organization that works with criminal defendants. See discussion below at page 29, and Exh. B at 6.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 2

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

was reached in March before the Guidelines Commission issued prospective amendments to Congress on April 27, 2023, to become effective in November 2023.

### B.   Application of Prospective Guideline Amendment (§4C1.1) Effective November 1, 2023.

Subsequent to the Plea Agreement, a separate related agreement modified the Plea Agreement, pursuant to which the Government does not object to application of a Sentencing Guidelines Amendment that added §4C1.1 (tentatively effective November 2023), and which provides an additional two-point offense level reduction based upon lack of criminal history ('zero-point offenders') with certain exclusions, none of which apply to Mr. Rosenberg. Thus, Mr. Rosenberg would be eligible for this two-point reduction. The U.S. Probation Officer concurs. PSR at 11, fn.3. ("I agree that Mr. Rosenberg appears to qualify for this proposed amendment.") "A sentencing court, of course, has the discretion to grant a variance from the Guidelines after promulgation but before adoption of a proposed amendment." *United States v. Ruiz-Apolonio*, 657 F.3d 907, 917 (9th Cir. 2011).[2]

If the additional two-point reduction of the prospective amendment is applied, the total offense level would be 11, and the Guideline imprisonment range would be 8–14 months. The Guidelines score would then be in Zone B, which—without a downward variance from the Guidelines—would make the defendant eligible both statutorily and under the Guidelines for home detention as a day-for-day substitute for any incarceration, which is the sentence jointly

---

[2] Application of the prospective Guideline also serves to save judicial time and resources, since defendants would otherwise be tempted to seek to extend their sentencing dates to gain the benefit of a more favorable Guideline amendment. Finally, the Commission is considering making this amendment retroactive.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 3

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

recommended by the parties in this Plea Agreement, as well as by the United States Probation Office. *See* 18 U.S.C. § 3561(c)(1); USSG §§ 5B1.1(a)(2); 5C1.1(c)(3) & (e)(3).

Notably, the Commission amended the §5C1.1 application note 4 to advise that *a sentence other than imprisonment* is "generally appropriate" if a person is in Zone B and receives the §4C1.1 reduction. *See also* 28 U.S.C. 994(j).

## III.   THE 18 U.S.C. § 3553(a) FACTORS

The Court's overarching statutory mandate is to "impose a sentence sufficient, but not greater than necessary, to comply with" the purposes of sentencing as set out in 18 U.S.C. § 3553(a). *Kimbrough v. United States*, 552 U.S. 85, 90, 111 (2007). In imposing a sentence, the sentencing Court must still consider the Guidelines, *United States v. Booker*, 543 U.S. 220, 261 (2005), but should not require extraordinary circumstances to justify a non-Guidelines sentence. *Gall v. United States*, 552 U.S. 38, 47 (2007). The carefully considered jointly recommended sentence is fully supported by analysis of the fundamental § 3553(a) sentencing factors, as shown below.

### A.   Nature and Circumstances of the Offense

#### 1.   Mr. Rosenberg's History as an Amazon Seller and Amazon Seller Advocate.

Over twenty years ago, Mr. Rosenberg began working in online sales. For over a decade, his primary business involved selling motorcycle audio equipment on multiple platforms. By 2015, selling on Amazon was the only substantial source of income for his family.

In mid-2015, Amazon suspended Mr. Rosenberg's business. Mr. Rosenberg was unaware of how to have it reinstated, and there were limited resources to help sellers like him with his many questions and concerns. He desperately read as much information as he could online, and spoke with sellers, consultants, and lawyers to try to figure out what to do.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 4

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Ultimately, after submitting multiple appeals, Mr. Rosenberg happened by chance upon the answer, and his business was reinstated. In this process, Mr. Rosenberg learned a great deal about Amazon's appeal process, and established relationships with lawyers, consultants, prominent sellers, and also some Amazon employees.

As a result of his personal experience navigating Amazon's complex seller suspension appeal process, Mr. Rosenberg founded ASGTG (an acronym for Amazon Sellers Group Telegram), an online social media forum for sellers to communicate in a positive way about shared problems and to help each other by asking for advice. Mr. Rosenberg continues to proctor this service to this day. He routinely responds to sellers' individual posts, advising sellers how to handle particular situations for no fee at all. He also took on an additional responsibility of proactively reviewing notable changes to Amazon's regulations and reviewing ASGTG posts, analyzing them, and compiling a weekly email intended to simplify and explain the rules so that typical sellers could comply with them.

ASGTG has spread throughout the world, with nearly 70,000 members on Facebook, and with tens of thousands on other platforms (the members are mostly sellers on Amazon). [3] ASGTG has also promulgated petitions to Amazon to enact changes that were important to sellers on the Amazon platform. Amazon has recognized ASGTG's impact by repeatedly sending representatives to its annual conventions and by asking Mr. Rosenberg to meet with

---

[3] In 2022 there were about 1.5 million Amazon third-party sellers, who generated income of well over $25 billion per quarter ($27.38 billion in Q2 of 2022). Amazon third-party vendors or sellers are independent businesses that sell their products on Amazon's platform. While Amazon sells many items independently, third-party sellers make up over 63 per cent of Amazon's overall sales. https://www.businessdit.com/amazon-third-party-seller-statistics/, last accessed July 4, 2023.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 5

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Amazon executives to discuss issues affecting sellers and how Amazon can best address sellers' needs.

Mr. Rosenberg regularly engaged directly with Amazon employees to provide seller feedback and engage in pro-active positive advocacy on behalf of reforms of Amazon's policies and procedures.[4] For example, many people, including other prominent seller consultants, brought to Amazon's attention that the information in the annotations (i.e., the reason *why* the seller was suspended) should be more available to a suspended seller and that the appeals process should be more transparent and user friendly. Gradually, Amazon began including additional information in suspension notices and, over time, as a result of these suggestions, has made the appeals process more transparent and navigable to sellers.[5]

Beginning with his own experiences, and then amplifying it through ASGTG, Mr. Rosenberg realized that one problem that sellers faced was that Amazon's computer algorithms mistakenly flagged conduct that was not actually against Amazon rules or regulations; was the result of false allegations by nefarious competitors; the result of unintentional errors by sellers acting in good faith to comply with Amazon's complex (and

---

[4] *See, e.g.*, emails compiled at Exh. C, where Amazon account-health employees reached out to Mr. Rosenberg, stating, for example: ("Ed, I've heard great things about what you and your groups do for Amazon Sellers. Might you have fifteen minutes to speak via phone over the coming days for me to understand your needs?"); ("Thanks for being an advocate for sellers, Ed!"); and ("Thanks, Ed! We're looking to add more detail to the information in this column in order to make it more helpful for Sellers (e.g., the specific type of Restricted Products violation). It's great you're noticing the changes we're making, and I appreciate the feedback.")

[5] *See, e.g., Amazon Helps Sellers Manage Their Account Health, About Amazon* (July 21, 2022), https://www.aboutamazon.com/news/small-business/amazon-helps-sellers-manage-their-account-health (last accessed July 4, 2023) (Article introducing new seller-friendly changes to the Terms and Conditions, by Dharmesh Mehta, Amazon Vice President, Worldwide Selling Partners.)

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 6

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

evolving) regulations; or were based on easily correctible conduct that would not otherwise result in suspensions.[6]

While Amazon did maintain a formal appeals process, its automated notices of suspension left many sellers without adequate information to determine what the alleged wrongdoing was, preventing sellers from effectively and directly responding to a suspension and appealing or correcting the alleged misconduct.[7] In the setting of Amazon's rapid growth, sellers were impeded from an opportunity to speak to a person with knowledge of the specifics of their case. In short, sellers did not have sufficient notice of the actual reason for the suspension and an opportunity to be heard on the truth or falsity of that reason prior to, or at least within a reasonable time of, the suspension, in order to conduct an appeal. In 2019, the anti-trust watchdog agency of the German government required Amazon to alter its terms of service to correct some of these problems, including requiring Amazon to give 30-days' notice before any suspension and a reason for removing a merchant from its platform, whereas before, Amazon "could end its relationship with, or block, a seller without warning or explanation."[8]

---

[6] Many of these problems are documented in the well-sourced article, attached as Exh. D; Josh Dzieza, *Prime and Punishment,* https://www.theverge.com/2018/12/19/18140799/amazon-marketplace-scams-seller-court-appeal-reinstatement, last accessed July 4, 2023.

[7] *See, e.g.,* Patrick McKnight, *Amazon Sellers Face Unique Legal Challenges in 2020,* American Bar Association (April 10, 2020), https://web.archive.org/web/20201204091431/https://www.americanbar.org/groups/business_law/publications/committee_newsletters/cyberspace/2020/202004/fa_1/ (last accessed June 16, 2023); ("Seller Suspensions. Many of Amazon's Terms of Service are notoriously vague. For many sellers, Amazon remains a black box. Enforcement often seems inconsistent and unpredictable. The first sign of a problem can be a suspended account. Communication with Amazon is difficult and sellers must submit a Plan of Action to be reinstated. For sellers dependent on Amazon for their revenue, this can be a massive interruption to their business.")

[8] *See Amazon in deal with German watchdog to overhaul marketplace terms* (July 17, 2019), https://www.cnbc.com/2019/07/17/amazon-in-deal-with-german-watchdog-to-overhaul-marketplace-terms.html (last accessed July 6, 2023).

---

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Without advance notice, some of these seller businesses, which often provided the sole income of the owner, his/her family, and their the employees and their families, would grind to a halt, frequently for reasons that turned out to be entirely innocent or easily correctable.

While the letters that accompany this memorandum document scores of such situations, the case of the Chukar Cherry, a Prosser, Benton County, candy business, a company that has been in business for 33 years, has a stand at Pike Place Market, and has been selling on Amazon since 2003, is emblematic of these problems. Mr. Chukar's case is documented in a Seattle Times investigative report, cited in the USPO Presentence Investigation Report, *see* PSR at 6, fn.1, and attached as Exh. E.[9] Chukar Cherries was suddenly suspended from the Amazon marketplace via an automated email that read "Your Amazon.com selling privileges have been removed…."*Id*. Amazon's fraud-prevention algorithms had erroneously concluded that Chukar was linked to a Chinese account that Amazon had deactivated for violating its policies. However, such a relationship did *not*, in reality, exist.

Chukar spent more than two months trying to prove his company had no relationship with the Chinese seller, repeatedly receiving an automated response: Amazon has "received your submission but (does) not have enough information to reactivate your account at this time." *Id.* The threat of being permanently banned from selling on Amazon loomed. It was only after an investigative reporter from the Seattle Times got interested and started making inquiries

---

[9] Katherine Anne Long, *Amazon abruptly banned Washington state treat-maker Chukar Cherries. Months of appeals went unheeded,* Seattle Times (Sept. 27, 2021), https://www.seattletimes.com/business/amazon/amazon-abruptly-banned-washington-state-treat-maker-chukar-cherries-months-of-appeals-went-unheeded/ (last accessed June 16, 2023), Seattle Times (Sept. 27, 2021), (last accessed June 16, 2023) (Seattle Times article documenting a suspension of a Seattle candy business based on false conclusions of the algorithm), attached as Exh. E.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 8

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

directly to Amazon that Mr. Chukar's account was reinstated, after 67 days, and then only after the Seattle Times' inquiry to Amazon about the suspension. *Id.*

Of course, most sellers did not ordinarily have the benefit of an interest by an important media outlet in Amazon's home town. Some, however, had the benefit of Mr. Rosenberg's involvement. The accompanying letters document the scores of these situations virtually identical to that of Chukar Cherries. *See* Exh. F.

- Letter from Anne Mason (documenting how her small family business was wrongly suspended by Amazon, their inability to reach anyone at Amazon to discuss the alleged problems, and Mr. Rosenberg's successful efforts to get the matter resolved by working diligently to connect them with a human being at Amazon, which employee then understood that Amazon's algorithm had made a mistake, and corrected the problem, resulting in reinstatement of Ms. Mason's family business) at Exh. F at 1–3.

- Letter from John and Sue Clifford (documenting how Amazon wrongly suspended their small business and Mr. Rosenberg helped get it reinstated for no fee) at Exh. F at 4–7.

- Letter from Henry Yedid (documenting how Amazon wrongly suspended his small business and Mr. Rosenberg helped get it reinstated after charging him only an initial consulting fee of $300.00) at Exh. F at 8–9.

- Letter from Peretz Bronstein (letter from lawyer in New York documenting how Mr. Rosenberg has assisted, "for no charge, perhaps a dozen of my clients facing partial or complete closure of their businesses by Amazon.") at Exh. F at 10.

- Letter from Ana Ochoa (documenting how Amazon wrongly suspended her small business and Mr. Rosenberg helped get it reinstated for no fee) at Exh. F at 11.

- Letter from Perry Dubinsky (detailing the difficulty he faced as a seller when the Amazon algorithm wrongly suspended his account, as well as his personal judgment of Mr. Rosenberg's character) at Exh. F at 12–14.

As administering ASGTG and responding to questions from sellers consumed more and more of Mr. Rosenberg's time—to the detriment of growing his motorcycle audio equipment business—Mr. Rosenberg, through his company Effyzazz, began charging fees for his services in more complicated suspension appeal cases. About half of Effyzazz's business focused on addressing sellers' compliance issues (with about a third of these involving reinstatements of

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 9

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

suspensions) while the other half of its business focused on other sellers' issues, including complicated reconciliations of inventory accounts (basic accounting work mostly resulting from Amazon's generous return policies).

## 2.     The Offense Conduct.

While the above provides important context for the offense for which Mr. Rosenberg stands before the Court, he does not offer it to justify or minimize his unlawful conduct. Mr. Rosenberg recognizes that his conduct was against the law and he fully accepts responsibility for his actions.

In the above-described environment, sellers often turned to consultants who could use their experience and connections to help decipher information from suspension notices and industry-wide trends, advise them on how best to proceed, and, given that information, prepare plans of action using optimal templates and wording to accomplish reinstatement of their accounts. A small fraction of Mr. Rosenberg's business was acting as such a consultant. But even experienced consultants were not always able to effectuate legal reinstatements of wrongful suspensions in this manner.

Given that these sellers were in the dark about their alleged wrongdoing, how to correct the problem, and when Amazon might recognize its error, sellers were frequently desperate and sometimes would resort to illegal means to obtain the information necessary to accomplish the goal of saving their businesses. The 'information necessary' was the annotations. Annotations were an internal record of the reasons a seller was suspended. Having the annotation—the written record of exactly *why* a seller's account had been suspended—was very helpful in devising a plan of action to get the account reinstated or explain to Amazon why the account had been wrongly suspended.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 10

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Recognizing the value of this information, Amazon employees began selling Amazon's internal annotations, which were Amazon's protected property, which then became available for purchase online via advertised services (on Google), creating, in effect, a sort of black market for annotations. Use of the illegally obtained annotations became ubiquitous. Consultants routinely used these black-market annotations to devise plans of action to address the violation to accomplish reinstatement, point out to Amazon that no violation had actually occurred and that the suspension was in error, or, in some cases, determine that a reinstatement was not possible and so inform the seller.

Mr. Rosenberg had a thriving legitimate business. *See* USPO Sent. Rec. at 4 ("In fact, by all accounts, most of his consulting work was legitimate and within the bounds of the law.") However, on certain occasions when he was unable to help desperate sellers with their reinstatement efforts in other ways, he used illegally obtained means to aid in his efforts. He obtained Amazon's private property (its internal annotations) from Amazon employees and also through the black market to learn the reasons for sellers' suspensions, to help with reinstatement. At those times, he directly and indirectly paid bribes to Amazon employees to obtain annotations and reinstate suspended accounts. These actions were against the law. He deeply regrets this misconduct. He has pleaded guilty to a felony crime and very publicly apologized for this criminal misconduct. *See* Exh. A, with the text of his apology appended. Mr. Rosenberg fully accepts responsibility for his criminal misconduct.

### B.      The History and Characteristics of the Defendant.

Ed Rosenberg is far more than his mistakes and misjudgments. He is a husband to Zehava Rosenberg with whom he has six children. All six of the children live in their home and depend on Mr. Rosenberg for emotional and financial support. He is a very devoted husband

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 11

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

and father who is always present for the needs of his family. Mr. Rosenberg is similarly caring for his mother and father who have lived near him his whole life. Mr. Rosenberg is also a religious person who attends services, obeys the tenets of Judaism, and contributes greatly to his secular and religious communities. He volunteers his time and efforts to the people around him in difficult situations. An examination of his history and characteristics reveal a fundamentally good person.

### 1.    Mr. Rosenberg's Personal History and Characteristics.

Mr. Rosenberg's grandparents were Holocaust survivors, with whom he has a very close relationship. Mr. Rosenberg's mother, Leah, writes, "Ed would go to their house to listen to their stories. He was a very curious little boy. But he was also very upset by the unfairness and wrongs." Exh. F at 15. Even then, Mr. Rosenberg apparently had a developed sense of the fairness and unfairness of life.

His parents were middle class people who had seven children. His mother, a homemaker, tended to the home and the children. His father was a computer programmer, but one job was not always enough to sustain the family. Mr. Rosenberg writes "They always refused government assistance when eligible, even though our large family could have used it, because my father wanted to 'make it on his own.' This meant he was working two or sometimes three jobs to provide for us and to give us everything we needed." Exh. A at 1. Despite financial strain, his parents paid for yeshiva, Jewish school, so that their children could be well educated, and well-versed in religion and morals. Mr. Rosenberg, in turn, became the first member of the family to go to college and followed in his father's footsteps in becoming a computer programmer before entering the e-commerce field.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 12

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Mr. Rosenberg grew up in Brooklyn, New York, surrounded by Orthodox Jews like himself. He grew up alongside his brothers and sisters, as well as many friends, with whom he would play all types of sports. He would even use sports as an opportunity for inclusion; as his brother-in-law Moshe Solomon writes, "he had a boy in his class that was mentally challenged… Ed would bring him home and play basketball with him in the yard for hours." Exh. F at 16. While his childhood was not without obstacles (Mr. Rosenberg has had to overcome a speech impediment) or troubles, Mr. Rosenberg remembers it fondly. *See* Exh. A (Ed Rosenberg letter); Exh. F at 15 (Leah Rosenberg letter).

As Mr. Rosenberg grew up, his temperament, financial circumstances, and desire to be helpful have made him the bedrock of his family.[10] His mother Leah writes, "he always finds the time to check up and show concern for us, his parents. He tries to see us at least once every week to make sure we don't need anything." Exh. F at 15. When one of his siblings is in need, they turn to him to help resolve the problem. When Mr. Rosenberg becomes aware of a problem, he rushes to assist.

Mr. Rosenberg's brother Mark writes, "Even though Ed is the busiest member of our family, Ed takes it upon himself to organize our family gatherings and calls, ensuring that our family stays connected." Exh. F at 18. He adds that Mr. Rosenberg makes meaningful efforts to connect with his nephews and nieces, "My son once mentioned to him that he enjoys hockey. Not long after that, Ed invited him to a NHL Game." *Id*.

---

[10] His brother-in-law Moshe Solomon writes of Mr. Rosenberg's tenacity, positivity, and resilience when he explains how Mr. Rosenberg started with his office in a storage unit, that was robbed one day, and responded with "it was meant to be. He literally started from scratch the next day by borrowing money to get more goods…" Exh. F at 16.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 13

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

The same is true for Mr. Rosenberg's in-laws. Shaul Sprung, his brother-in-law writes that he turns to Mr. Rosenberg not only for business advice (real estate), but also for advice on his children's education. Mr. Rosenberg remains attentive and "will routinely check in with me and will make my issues the only thing that is of importance in the conversation, even while he has his own issues to deal with." Exh. F at 20.

Mr. Rosenberg married Zehava twenty-five years ago. They have a very strong bond, and she writes that she couldn't ask for more from a husband. She strongly supports him despite his wrongdoing and its impact on their family because, despite these actions, she believes that he is a good person, a better husband, and a great father to each of their six children. Exh. F 22–23.

All six of their children still live in the Rosenberg's home. Three are minors who are still in school. The three older ones have steady and distinct jobs—a nurse, a personal trainer, and a teacher—which reflects how each one was able to flourish expressing their own individuality. "We're so proud of each of them for what they are doing and who they are." Exh. A at 1 (Ed Rosenberg letter). Mr. Rosenberg is an ever-present father, who loves spending time with his children at home, on vacations, or playing or watching sports. All of them still rely on Mr. Rosenberg's income, in whole or in part, to support them financially. And all of them still rely on their father for emotional support, as the person they turn to when they are going through a difficult time. Exh. F at 22–23 (Zehava Rosenberg letter).

Rabbi Judah Kravitz writes of Mr. Rosenberg as a father; "He puts his soul into his family,…" with a focus on education, and that "He is indeed succeeding, and his children, under his guidance, are socially strong, and are achieving academic high marks." Exh. F at 24.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 14

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

## 2.       Mr. Rosenberg's Character.

While Mr. Rosenberg has committed a crime, pleaded guilty, and publicly apologized for it, the people with whom he interacts, including professionally, know that he is a person of good character and good deeds, as detailed in their numerous letters attached to this memorandum. With the Court's indulgence, we will not repeat all of these sentiments here, but include a few excerpts that reflect Mr. Rosenberg's character.

Mr. Rosenberg considered that sellers sharing information that he had learned might be to their mutual benefit, and initiated ASGTG. Most sellers focused on themselves and generally viewed other sellers as competitors. "There was a silent fear that if you shared and supported one another, one's trade secrets would be out and the competition would hurt us. Ed Rosenberg changed that dynamic." Exh. F at 26 (Peshy Friedman letter). As seller Shaul Edelman explains, prior to Ed's formation of ASGTG, "There was a feeling of facing the Amazon behemoth alone…" but after he found ASGTG "[s]uddenly, I wasn't alone, as I found a network of support!" Exh. F at 28.

Mr. Rosenberg started by sharing the information on a group chat among the several sellers that he knew. Word spread of this chat, and people kept requesting to join. Soon, the platform changed to Telegram to allow for many more participants. That is how Amazon Sellers Group Telegram ("ASGTG") was formed and has grown to nearly 70,000 members on its Facebook platform alone. With so many sellers, the odds multiplied that someone would have the requisite knowledge to guide a struggling business through any given problem. ASGTG became an important free resource for sellers seeking assistance with their compliance questions and Mr. Rosenberg's weekly emails to advise on compliance changes and enforcement trends were intended as free proactive measures to simplify the rules so that typical

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

sellers could comply with Amazon's complicated and evolving rules. As Ms. Camille Catelo, founder of Alpha Health Omega, writes, "Without Ed, I don't know if my business Alpha Health Omega would have survived this past year. I am not one of Ed Rosenberg's clients, but his ASGTG group has helped me get through tough times without monetary payment. I was able to find support in the group and this helped with the success of my business." Exh. F at 27.

Mr. Rosenberg personally contributes to the posts, providing his own experience and knowledge to questions without compensation. As Amy Wees writes, "Over the months, I have observed Ed regularly responding to group postings by offering assistance. Time and time again, I've witnessed the original posters gratefully exclaiming their victories, thanks to Ed's intervention and support." Exh. F at 30. Also importantly, as Marcus Wiggins writes, "I was shocked at the amount of valuable information that was provided for free by Ed on his platform. Ed provides updates on Amazon's rules, account issues, unfair suspensions, and other issues that could risk our Amazon seller's account." Exh. F at 31. ASGTG enabled him and his wife to understand the rules and to have the confidence to make selling on Amazon a full-time job.

As ASGTG grew, Mr. Rosenberg began hosting annual events for ASGTG members to gather, connect, and share information. Amy Wees writes, "These events bring sellers together, providing a platform for networking and learning from each other." Exh. F at 30.

Moreover, ASGTG began compiling and circulating successful petitions to Amazon to improve its policies and procedures based on sellers' concerns. *See* Exh. F at 32 (Yael Cabilly letter).

Mario Simonyan, an intellectual property lawyer who serves Amazon sellers, writes of Mr. Rosenberg's numerous contributions to the sellers' community, including helping "many of the top 200 sellers, navigate the complex landscape of Amazon suspension and compliance

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 16

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

matters… and instrumental in helping small businesses thrive in an increasingly competitive market." Exh. F at 34.

Cassie Stein writes how Mr. Rosenberg "has worked tirelessly to help me reactivate my account when suspensions have occurred." Exh. F at 36. On one occasion, Mr. Rosenberg worked with her "throughout the night to create a plan of action" on a Saturday night after her account was frozen when she could not respond to Amazon on a Sabbath. *Id*. She adds that Mr. Rosenberg not only goes the extra mile, but also recently provided her with "countless hours of free consulting to help me address an issue with someone infringing on my listings." *Id*.

Gary Tan, a business associate turned friend, writes of Mr. Rosenberg's business acumen and positive calm attitude, and how "Ed and his team were able to unblock me with several hurdles that I was facing… in a concise and succinct manner, saving my company in different aspects, both monetary and non-monetary as well as enabling my company to keep its employees hired…" Exh. F at 37.

Nehad Zabad writes of Mr. Rosenberg's "rapid and immediate responses…" and that Mr. Rosenberg was able to meet with him for thirty minutes, identify the problem, sympathize with the situation in which the account had been frozen for several months, and spend a few days to help get the issues resolved. He adds that Mr. Rosenberg's widespread respect and admiration among the sellers' community is deserved. Exh. F at 38. And Deborah Roberts, a marketing consultant, writes of Mr. Rosenberg's positive professional reputation for his business and ASGTG, and includes snapshots of comments from a handful of grateful sellers. Exh. F at 40.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 17

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

While Mr. Rosenberg's company Effyzazz became a popular consulting company, whenever practicable, Mr. Rosenberg would refer matters to ASGTG or not charge for his services. And as the business became more self-sufficient and he was able to rely on his employees to perform the more standard consulting (e.g., assisting with preparing plans of action), Mr. Rosenberg was able to focus on his passion project of ASGTG (and his uniquely individual acts of generosity with his escalations.) His brother Mark refers to these efforts as "Ed's greatest joy, apart from his children." Exh. F at 19. As Mr. Rosenberg explained, "I love Amazon . . . The Amazon community has given me meaning and a livelihood and has even welcomed many of my siblings and in-laws. It is a community that I am proud to be a part of." Exh. A at 2. And as his wife Zehava writes, when he sees someone in need, he is deeply affected; "Ephraim feels the wrong and the suffering. It hurts him. So, he works all hours to try to help these people." Exh. F at 22.

Mr. Rosenberg has also been a caring and attentive employer. Riza Navarro, his assistant, writes that when her husband was hospitalized, and she could not work for nearly a month, he continued to pay her, and offered to ship medicine for her husband. "Ed showed me that he is not just my employer but a person who has a big heart and who is always ready to help whenever you're in need; you don't even have to ask." Exh. F at 43. Sarah Halberstam has worked with Mr. Rosenberg for six years and also speaks glowingly of Mr. Rosenberg's effort and his integrity, providing multiple examples of how little Mr. Rosenberg cares about making profit. Exh. F at 44–46.

But Mr. Rosenberg was also notably kind to workers for companies that happened to work alongside his. Jacob Hatanian worked for a different company in the same warehouse as Mr. Rosenberg, "Ed Rosenberg used to always buy his employees lunch, snacks, and drinks.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 18

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

He would always come and ask my co-worker and I if we wanted anything as well and he would always buy lunch, snacks and drinks for us as well. Even though we didn't work for him… Even though he was an owner of business I felt like we were friends and he really cared about us." Exh. F at 47.

In addition to spending an enormous amount of time on ASGTG, Mr. Rosenberg's most charitable endeavors are his escalations—informal unofficial appeals of Amazon suspensions directly to Amazon officials. Through Mr. Rosenberg's networking efforts, the attention that ASGTG wielded, and his extensive experience (at knowing what Amazon was seeking), he was very successful at escalations. Mr. Rosenberg would forward the company's plan(s) of action to one of his multiple Amazon contacts, and the seller would finally have a person genuinely review the merits of the request for reinstatement. These escalations would sometimes include a video with a seller on Mr. Rosenberg's YouTube channel where he interviewed the seller about the impact of the suspension on the company and its employees.

The escalations had an immeasurable impact on the seller companies, many of which were in the same position as Mr. Rosenberg had been with his motorcycle audio equipment business in 2015. In this way, Mr. Rosenberg has escalated well over 1,200 cases, almost all of them for free. Exh. A (Ed Rosenberg letter). While over half of them were existing customers that had previously paid a modest fee for his consulting services, he did not charge any extra for these escalations because he felt it was important that these companies get reinstated. Henry Yedid writes of his kitchen appliance company's struggles, that many of their products were removed, and they lost business for weeks, even having to lay off a worker before contacting Mr. Rosenberg. Mr. Rosenberg eventually called Mr. Yedid at 1:00 a.m. with the idea of recording a video. Shortly after that, Mr. Yedid was enabled to speak with an Amazon official

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 19

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

who for the first time explained the issue at hand to Mr. Yedid, which enabled him to fix the problem. "I could not believe, for a measly $300, that wasn't even paid yet, he spent countless hours and days and weeks personally helping my case. This was not a business practice. This was a true friendship with a man I never even met in person." Exh. F at 8.

Nearly half of Mr. Rosenberg's escalations were performed for no compensation at all. And "in 85% of [social media escalation] cases, Ed chose to publicize the stories of sellers who had never paid him anything. They would reach out for free, and their stories broke Ed's heart, so he felt compelled to do what he could to try and bring attention to their cases, without charging a penny." Exh. F at 44 (Sarah Halberstam letter). Mr. Rosenberg would find someone who needed help online, and then almost anonymously put forth his time, his effort, and his clout for these people… to save their businesses. And because of those free efforts, it is likely that there are thousands and thousands of jobs that were salvaged. As Jakub Novotny writes, "…saving someone's business means saving their life because, to reiterate, their families and their employees depend on them. It's not much of an exaggeration to say that Mr. Rosenberg is a lifesaver… This is why I believe in Ed and in him being a lifesaver because I see him every day or every week saving the lives of his fellow sellers, and we all respect him and love him for that." Exh. F at 49.

Anne Mason explains that she and her husband own an ecommerce business called Blinkee.com, LLC, selling event-related goods since 2009. This business supports them and their two children. In 2019, the business was suspended and each communication "yielded what seemed to be standard form letters. He could not reach anyone in person, and we did not know the reason behind the suspension… We were panicking…" They paid for a consultant to assist them, but that consultant was not responsive and basically repeated their own efforts. They

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 20

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

encountered Mr. Rosenberg who spoke to them personally. "The relief we felt at finally being heard and understood was enough to bring us to tears. There is no way anyone could fake that level of human connection and understanding, and we knew at once that we were in the best hands." Mr. Rosenberg connected them with someone at Amazon who told them how to correct the problem. Within a few weeks, the suspension was lifted, and their business was restored. She adds, "During and shortly after our suspension, we discovered an entire community of Amazon sellers who literally owe Ed their livelihoods after having experienced similar and often worse than what we did…" Exh. F at 1–3.

John and Sue Clifford describe at length their difficult situation when their company, SF Trading Online Ltd.—which employed several individuals, many single mothers—was suspended by Amazon in 2019. They learned that they were suspended because of a false complaint submitted against them by a competitor. Even after a retraction by the competitor, and weeks of inactivity costing them almost £100,000 in revenue, the company was about to fold. Mr. Rosenberg reached out to them. "At no time did Ed ask us for any money in exchange for any service, he simply asked us what had been going on and we had no reason to do anything else other than tell him the exact facts." Mr. Rosenberg reached out to his contacts, and made sure that they received attention, which caused the account to be reinstated. Exh. F at 4–7.

Ana Ochoa also writes that she made "a comment in an inquiry on the page [Ed Rosenberg's Facebook page]… and Ed responded and messaged me. He selflessly offered his experience, advise, and services at no cost." Within a week, her account was reinstated. Exh. F at 11.

Kerri Fox writes that her 30-year-old company was suspended. Mr. Rosenberg returned her message, listened to her story, and "He made no promises that he could fix anything other

than that he would speak to someone he knew and could at least get an audience to explain the situation and be an advocate on our behalf…" The process took several days, but the account was reactivated and Mr. Rosenberg "never asked me for any compensation, and I have never paid any to him or anyone affiliated with his team." Exh. F at 50–51.

Peretz Bronstein, a prominent New York lawyer writes of his professional relationship with Mr. Rosenberg; "Over the years he has assisted, for no charge, perhaps a dozen of my clients facing partial or complete closure of their businesses by Amazon." Exh. F at 10. Attorney Michael Steinmetz, with whom Mr. Rosenberg has done work, writes, "It would not be a stretch to say that hundreds, perhaps thousands, of families continue to be supported as a direct result of the work Ed has done for free for the honest amazon seller community that is constantly battling against bad actors and black hat techniques." Exh. F at 52.

Mr. Rosenberg also performed social media escalations for free on his social media accounts. Attorney Yael Cabilly writes, "He prepared YouTube videos to share stories of sellers, who lost their business due to Amazon's mistakes-and helped them save their business." Exh. F at 32.

Maria Vinnik writes of how her accounts were shut down for nearly two years, and she sought help, in part because her business helped fund her children's ballroom dancing competitions (both national champions). Mr. Rosenberg helped organize a social media campaign, including a flash mob to raise awareness of her situation and she credits Mr. Rosenberg for the reinstatements; "I clearly understand that if not for Mr. Rosenberg's support of my case it would never happen." Exh. F at 54.

Asaf Cohen writes that Mr. Rosenberg helped him resolve a business issue without requesting money or referring any services. He also notes, "The declared goal of the group

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 22

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

[ASGTG] is to help the community itself and not making money out of it. In other groups, the admins will try to generate leads for this products/services, will censor posts and comments according to their personal agenda and their business interests and not the good of the sellers' community. There are no courses sold by him, no lead referrals or fees." Exh. F at 56.

Matteo Lombardi explains that on ASGTG's page, "he lists all the vetted service providers in the industry and is quite allowing of who can get into the list, while he could easily bar entrance into the list by competitors, to serve his purpose of making more money." Exh. F at 58–59.

Rick Mirsky, owner of an e-commerce consulting firm writes that when his new budding business was struggling on a startup budget, Mr. Rosenberg offered him a "deep discount" to be able to market his services at an ASGTG event and offered him "PRIME placement of my booth…" and additional free marketing. Exh. F at 60.

Sarah Halberstam, who works with Mr. Rosenberg, writes that he advertised competitor-consultants on his ASGTG, referred other consultants, offered many services for no cost, offered many services at steep discounts, discouraged potential clients if they had an unlikelihood of success, and successfully advocated for Amazon policies that diminish the need for his business. She also writes that "Ed is a very humble individual" who during an ASGTG event he hosted was not in the limelight, but rather in a side-room communicating with another seller in need. Exh. F at 45.

Similarly, Ben Lapin writes that Mr. Rosenberg is "a nice humble guy who… never let his success get to his head… Effy prefers to wear sweatshirts and keep a low profile and always has time to help everyone rich or poor…" Exh. F at 61.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 23

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Rabbi Yehuda Kravitz, writes, "he is involved in all aspects of charitable endeavors, always there to lend a helping hand, a friendly ear, and to take kind action when needed…" Exh. F at 24. Rabbi Nahum Rabinowitz writes "He has also opened his home to host community events and regular prayer meetings." Exh. F at 63.

Not only does Mr. Rosenberg's large family depend on him, but the whole community relies on him because of how much he provides for them. As his brother Mark writes, Mr. Rosenberg spearheaded an effort to set up older single women in the community with potential marital matches. "He undertook this initiative to alleviate the emotional pain experienced by these individuals. When Ed sees a problem, he tries to fix it." Exh. F at 18.

Asher Edelstein, a longtime friend of Mr. Rosenberg, writes that on Purim, the most festive day of the Jewish year, they forewent revelry, but rather "spent the day in the Hospital, visiting and cheering up sick patients, so they too can smile on this special day." Exh. F at 64.

Mr. Rosenberg's friends also write that he has always been there for them. Aaron Eichhorn writes of how he would turn to Mr. Rosenberg to borrow money to cover bakery expenses in their youth. A few years later, Mr. Rosenberg was actively trying to "befriend" and "encourage" a depressed student on a trip abroad. And then a few years later, Mr. Eichhorn recruited Mr. Rosenberg to help raise funds for a community member diagnosed with colon cancer, who had four children. "Ed has organized a group of college friends to unite on behalf of his family and ensure that their physical, emotional and spiritual needs are met, so that they are cared for during these trying times." Exh. F at 65–66.

Moshe Lieberman writes that Mr. Rosenberg helped a classmate out when he helped "put together a list of friends who can help raise money and maybe even invite him over to help raise his spirits and keep him going." Exh. F at 67. Joseph Glieberman writes of Mr.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 24

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Rosenberg's raising substantial funds for a friend in need of a down payment for a home wherein he demonstrated "outstanding leadership, sensitivity, and empathy." Exh. F at 70.

When Ben Lapin's son was hurt playing basketball, Mr. Rosenberg and his daughter (a nurse) "sprung into rescue action called an ambulance and both of them took him to the emergency room in Middletown staying with him and bringing him home at 2:00 am" Exh. F at 61–62.

Rabbi Nahum Rabinowitz, his temple's rabbi, writes that "Ed is a regular attendee in synagogue services and activities; he is good-natured, modest, unselfish, and generously gives of his time to assist others in the community." Exh. F at 63. Mr. Rosenberg is also involved in studying the tenets of the Talmud; Sholom Schneider writes that they "have been studying Talmud together" for a few years including virtual sessions during the pandemic. Exh. F at 71. And Meyer Silber, a business connection turned friend, writes "His generosity and kindness displays in his personal life as well. He is well liked and respected. He is asked to speak publicly at synagogue gatherings which is always well-received, and he is a source of wisdom and advice, and support, to many." Exh. F at 72. Mr. Bronstein writes that when Mr. Rosenberg spoke at a function, "People claim he was the first one there and the last to leave. He even helped clean up afterwards." Exh. F at 10.

In addition to his good character, the other § 3553(a) factors also support the sentencing recommendation before the Court.

**C.      Sufficient Punishment to Reflect the Seriousness of the Offense.**

The narrative of the USPO's Sentencing Recommendation accurately reflects a balancing of factors and the adequacy of the requested sentence as a just punishment for Mr. Rosenberg:

A probation sentence with one year of home confinement is an appropriate punishment in this case.

\*          \*          \*

[A]lthough this conduct was serious, there are mitigating factors to consider. Before his involvement in this offense, Mr. Rosenberg has never been convicted of a crime, and it appears that prior to his involvement in this offense, he was a law-abiding member of his community. Additionally, while Mr. Rosenberg's co-defendants engaged [in] malicious activity such as defacing accounts and attacking competitors, Mr. Rosenberg did not. Mr. Rosenberg also did not develop this scheme, nor did he direct other people. In fact, by all accounts, most of his consulting work was legitimate and within the bounds of the law. Balancing the aggravating and mitigating factors here, I believe two years of probation with one year of home confinement is appropriate. This sentence captures both the harmful conduct and Mr. Rosenberg's role in the scheme.

USPO Sent. Rec. at 4.[11]

 "[P]robation, rather than 'an act of leniency,' is a 'substantial restriction of freedom.'"

*Gall*, 552 U.S. at 44.

In the past, Mr. Rosenberg has had a sterling reputation in his community; his actions have now tarnished his otherwise excellent standing and he has been thoroughly shamed. Mr. Rosenberg now has a felony criminal record. While he had a strong positive Internet presence prior to this, he has since been attacked relentlessly and publicly, sometimes for things mentioned in the Indictment that he did do, and sometimes for things he did not do.

---

[11] Congress has expressed its intent that District Courts regard probation as a distinct type of sentence with independent value, as opposed to a lenient option to be used only in extraordinary cases. *See* 18 U.S.C. § 3582(a) (courts must "consider the factors set forth in section 3553(a) to the extent that they are applicable" in "determining *whether* to impose a term of imprisonment") (emphasis supplied). Indeed, Congress explicitly mandated that the Sentencing Commission, in formulating the Sentencing Guidelines, "shall insure that the guidelines reflect <u>the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense</u> []." 28 U.S.C. § 994(j) (emphasis added). By that mandate, Congress effectively deemed probationary sentences to be presumptively appropriate in such cases. That Congressional intent has recently been fortified by a proposed Guidelines amendment to §5C1.1 application note 4 to advise that a sentence other than imprisonment is "generally appropriate" if a person is in Zone B and receives the §4C1.1 reduction.

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

Opportunistic competitors, Internet trolls, and even uninformed casual observers have accused Mr. Rosenberg of the malicious crimes of his co-defendants. His wife Zehava writes, "Where Ephraim was once very proud of his strong Internet presence, now there is a lot of shame. I know Ephraim has learned his lesson and will not do anything like this again." Exh. F at 22.

Mr. Rosenberg is a genuinely good man with strong religious values. Mr. Rosenberg has spent nearly three years worrying about the consequences of his actions. On a personal level, he has had to contend with why he committed these crimes and how much they have impacted his family and his community. His brother-in-law Shaul Sprung writes that "Ed is crushed that his actions have brought his family so much pain" emotionally and even harming his children's marriage prospects within the Orthodox Jewish community. Exh. F at 20.

Mr. Rosenberg has apologized to the Court, to his parents, to his wife and children, to Amazon, and to the sellers' community, for his actions. Having put so much effort in being a positive presence in the lives of the people around him, especially the sellers' community, and his family, Mr. Rosenberg has to live with the fact that his actions have put them through this traumatic experience. Exh. A. That has been—and will continue to be—a substantial additional punishment for him.

### D.  Adequate Public and Individual Deterrence.

Mr. Rosenberg is not likely to commit another offense. As the PSR notes, the proposed sentence "is sufficient to deter Mr. Rosenberg while also protecting the public from his behavior." USPO Sent. Rec. at 4. Each of the dozens of letter writers discuss Mr. Rosenberg's positive traits; they all believe Mr. Rosenberg is a decent person. He has spent the vast majority of his life very far from any criminal activity. Nor has he committed another crime. And he has written that "I let down so many people with my illegal actions... I accept responsibility for my

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 27

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

actions… I promise the Court that nothing like this illegal conduct will ever happen again." Exh. A at 2.

Mr. Rosenberg personally initiated his offer to provide a full and complete public apology. Mr. Rosenberg has publicly atoned for his actions in his public apology, which is attached to his letter to the Court. Prior to making it public, Mr. Rosenberg vetted the text of his proposed public apology with the Government and changed the text to reflect the Government's suggested amendments. It should be noted that, prior to entering his guilty plea in this case, Mr. Rosenberg broadly distributed the personal apology on his YouTube channel (with an introductory video), his Twitter account, ASGTG's Telegram account, his Facebook account, his Instagram account, and his LinkedIn account. These posts reached ASGTG's estimated (approximate) 70,000 members, tens of thousands of other sellers in the Amazon industry, and seller-consultants in the Amazon space. The apology also made national news, including an article on CNBC. His apology acknowledged his guilt, explained his wrongdoing, and urged readers and viewers to abide by the law and adhere to Amazon's terms and conditions, presenting his own account as a cautionary tale. It is significant that this full-throated apology and its admonition for future Amazon rule-compliance has been directly distributed by Mr. Rosenberg to the optimal demographic for deterrence of Amazon Marketplace-based crimes.

The proposed sentence, along with Mr. Rosenberg's actions, satisfies both individual and general deterrence.

### E.      Remorse and the Need for Rehabilitation.

Ben Lapin, a friend and neighbor writes "I know… how remorseful Effy is staying up at night worrying about his wife and children and he really could not forgive himself for hurting

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 28

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

his wife and kids." Exh. F at 62. His rabbi writes how Mr. Rosenberg confides in him, "he has acknowledged his errors and responsibility for same. I believe that he is truly remorseful and will act with stronger conviction to his morals in the future." Exh. F at 63 (Rabbi Nahum Rabinowitz letter).

If Mr. Rosenberg is allowed to continue his charitable efforts and good works, he can continue to aid the community, but just as importantly, he can continue to improve himself. Mr. Rosenberg has pledged 260 volunteer hours, in five 30-minute mentoring sessions per week for two years (via phone or Zoom), to assist, guide, and mentor individuals starting e-commerce sales businesses. These volunteer efforts will be monitored by the Aleph Institute, a national organization that works with criminal defendants. Exh. B at 6.

Furthermore, the USPO has "recommended release conditions that will appropriately monitor Mr. Rosenberg's business and financial dealings" and ensure that any necessary rehabilitative goals are satisfied. USPO Sent. Rec. at 5. Additionally, Mr. Rosenberg has already tendered the jointly recommended $100,000.00 fine to the Clerk of the Court. *See* June 26, 2023 Receipt # SEA200002355 referenced on docket confirming deposit of funds into the Court Registry. *See also* Dkt. 189.

Mr. Rosenberg's cooperation with the Government immediately after his Indictment is also indicative of his nature, respect for promotion of the law, deterrence of crime, and of his attempts at rehabilitating himself. This cooperation effort, which culminated in a December 2020 proffer session, warrants the Court's consideration.[12] Early on in the case, this signaled to

---

[12] Cooperation, short of warranting a 5K1.1 motion, is relevant to the 18 U.S.C. 5533(a) factors. *Gray v. United States*, 2019 WL 3564824, at *7 (W.D. Wash. Aug. 6, 2019) ("the mere fact of her attempted cooperation would have been a matter of mitigation properly considered by the Court" demonstrating respect for the law and assurance that the defendant was leaving 'criminal life behind'").

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 29

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

the Government that Mr. Rosenberg was accepting responsibility for his actual misconduct and was intending to settle the case rather than put the Government to its proof.

At the meeting, Mr. Rosenberg admitted to his own wrongful activity to which he has since pleaded guilty. This speaks to his acceptance of responsibility and to his genuine remorse for his actions. Mr. Rosenberg also assembled and provided the Government with hundreds of documents for that meeting, and provided information on multiple individuals and companies (sellers and consultants) who were involved in substantial wrongdoing including review manipulation and attacks. He also provided a number of leads available for the Government to pursue, including against Amazon employees. Mr. Rosenberg's efforts to atone for his actions demonstrate a desire for rehabilitation that a genuine respect for the law and for the goal of cleaning up the Amazon sellers' community and to protect other individuals and businesses from nefarious activity. Mr. Rosenberg's apology is also a demonstration of his genuine remorse and his personal rehabilitative resolve.[13]

### F.    The Need to Avoid Unwarranted Sentencing Disparity.

Mr. Rosenberg's criminal conduct is significantly different, both in the degree and nature of his involvement and his motivation, than his codefendants. *United States v. Osanyinbi*, 2019 WL 993617, at *5 (D. Or. Feb. 28, 2019) (courts can consider the relative culpability of codefendants). Mr. Rosenberg's actions were intended to help sellers maintain their businesses

---

[13] A public apology may serve a rehabilitative purpose. *See United States v. Gementera*, 379 F.3d 596, 602 (9th Cir. 2004) (upholding as both rehabilitative and generally deterrent a sentence requiring, *inter alia*, that the defendant who had pilfered mail stand outside a post office with a sign indicating that he committed this crime and that holding the sign was part of his punishment.)

Mr. Rosenberg's voluntary initiative in this regard is telling of his character and of his genuine remorse. He voluntarily tarnished his public persona and brand, not just by pleading guilty, but also by admitting his actions and their wrongfulness directly to his entire professional community.

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 30

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

and the livelihoods of their families and employees. Moreover, unlike his co-defendants, the vast majority of Mr. Rosenberg's work was entirely legitimate whereas, with many of his co-defendants, the foundation of their businesses was predicated on malicious criminal activity:

> Notably, Mr. Rosenberg did not engage in the same malicious activity as several of his co-defendants. Specifically, he did not deface any product listings manipulate customer reviews, or otherwise attack competitors by posting negative reviews or submitting fake complaints.

USPO Sent. Rec. at 4.

After a thorough and detailed review and discussion of the voluminous evidence by the parties, these differences in the relative culpability of the defendants are also reflected in the dramatic differences in the agreed statements of fact—describing the core misconduct of each defendant—in the various defendants' plea agreements. *Compare, e.g.*, Rosenberg plea agreement statement of facts at Dkt. 182 ¶8, *with* statement of facts of Leccese Plea Agreement at Dkt. 125 ¶8; Nilsen Plea Agreement at Dkt. 131 ¶8; and Nuhanovic Plea Agreement at Dkt. 150, ¶9. Also, notably, two of the co-defendants also pled guilty to tax evasion offenses.

The USPO Sentencing Recommendation also notes the more serious misconduct of the other defendants and Mr. Rosenberg's lesser role in the offense:

> [W]hile Mr. Rosenberg's co-defendants engaged in malicious activity such as defacing accounts and attacking competitors, Mr. Rosenberg did not. Mr. Rosenberg also did not develop this scheme, nor did he direct other people. In fact, by all accounts, most of his consulting work was legitimate and within the bounds of the law.

*          *          *

> The joint recommendation in this case seeks to fully acknowledge Mr. Rosenberg's lesser role in the offense while balancing it with the need to avoid unnecessary sentencing disparity . . .

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 31

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

USPO Sent. Rec. at 4, 5. The jointly recommended sentence thus properly reflects the relative culpability of the co-defendants and appropriately avoids any unwarranted disparity.

## IV.   CONCLUSION

Mr. Rosenberg is a fundamentally good man. He is devoted to his large family who depend on him. He is committed to his community, both by active involvement and by extensive efforts for individuals in need. This nature is most evident in his professional life where Mr. Rosenberg routinely declines payment for his services in exchange for helping struggling business stay afloat to save countless jobs. He is an incredibly steady individual, for whom this criminal activity was an enormous aberration.

Mr. Rosenberg has been punished severely for his crime. His public record is tarnished, his reputation in his community is diminished, and he has spent the last several years regretting his actions and fearing its consequences. Considering the entirety of his life, he poses little risk of recidivating and has spent his public capital discouraging others in his community from engaging in this type of behavior. The proposed sentence is "sufficient, but not greater than necessary, to comply with" the purposes of sentencing as set out in 18 U.S.C. § 3553(a). *Kimbrough*, 552 U.S. at 90.

/////

/////

/////

/////

/////

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 32

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500

1    We therefore respectfully ask that Court to impose the sentence jointly recommended

2    by the Government, the defense, and the United States Probation Office.

3

4    Dated this 7th day of July, 2023.

5

6                                                        Respectfully submitted,

7                                                        JACOB LAUFER, P.C.

8            By:    _Jacob Laufer_____

9                   Jacob Laufer, Esq.
                    Mark Ellis, Esq.

10                  65 Broadway, Suite 1005
                    New York, New York 10006

11                  (212) 422-8500

12                  _____

13                  Peter Offenbecher, Esq.
                    SKELLENGER BENDER, P.S.

14                  520 Pike Street, Suite 1001
                    Seattle, WA 98101

15                  (206) 623-6501

16                  *Counsel for Defendant Ephraim Rosenberg*

17

18

19

20

21

22

23

DEFENDANT EPHRAIM ROSENBERG'S
SENTENCING MEMORANDUM – 33

JACOB LAUFER, P.C.
65 Broadway, Suite 1005
New York, NY 1006
(212) 422-8500